AO 241 (Rev. 09/17)

# Petition for Relief From a Conviction or Sentence
# By a Person in State Custody

## (Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus)

### Instructions

1. To use this form, you must be a person who is currently serving a sentence under a judgment against you in a state court. You are asking for relief from the conviction or the sentence. This form is your petition for relief.

2. You may also use this form to challenge a state judgment that imposed a sentence to be served in the future, but you must fill in the name of the state where the judgment was entered. If you want to challenge a federal judgment that imposed a sentence to be served in the future, you should file a motion under 28 U.S.C. § 2255 in the federal court that entered the judgment.

3. Make sure the form is typed or neatly written.

4. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

5. Answer all the questions. You do not need to cite law. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit any legal arguments, you must submit them in a separate memorandum. Be aware that any such memorandum may be subject to page limits set forth in the local rules of the court where you file this petition.

6. You must pay a fee of $5. If the fee is paid, your petition will be filed. If you cannot pay the fee, you may ask to proceed in forma pauperis (as a poor person). To do that, you must fill out the last page of this form. Also, you must submit a certificate signed by an officer at the institution where you are confined showing the amount of money that the institution is holding for you. If your account exceeds $_____, you must pay the filing fee.

7. In this petition, you may challenge the judgment entered by only one court. If you want to challenge a judgment entered by a different court (either in the same state or in different states), you must file a separate petition.

8. When you have completed the form, send the original and _____ copies to the Clerk of the United States District Court at this address:

**Clerk, United States District Court for**
**Address**
**City, State  Zip Code**

If you want a file-stamped copy of the petition, you must enclose an additional copy of the petition and ask the court to file-stamp it and return it to you.

9. **<u>CAUTION:</u> You must include in this petition all the grounds for relief from the conviction or sentence that you challenge. And you must state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

10. **<u>CAPITAL CASES:</u> If you are under a sentence of death, you are entitled to the assistance of counsel and should request the appointment of counsel.**

AO 241 (Rev. 09/17)

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District Massachusetts | |
|---|---|---|
| Name (under which you were convicted):<br><br>Antonio Rodrigues | | Docket or Case No.:<br><br>1473CR00321 Bristol Count |
| Place of Confinement: MCI Shirley Medium, P.O. Box 1218, Shirley, MA 01464 | | Prisoner No.: |
| Petitioner (include the name under which you were convicted)<br>ANTONIO RODRIGUES | v. | Respondent (authorized person having custody of petitioner)<br>MICHAEL RODRIGUES, Superintendent, MCI Shirley Medium |
| The Attorney General of the State of Commonwealth of Massachusetts | | |

## PETITION

1.  (a) Name and location of court that entered the judgment of conviction you are challenging:

    Bristol Superior Court, Fall River, MA

    (b) Criminal docket or case number (if you know):   1473CR00321

2.  (a) Date of the judgment of conviction (if you know):   11-25-2105

    (b) Date of sentencing:   11-25-2015

3.  Length of sentence:   Life imprisonment

4.  In this case, were you convicted on more than one count or of more than one crime?   ☑ Yes   ☐ No

5.  Identify all crimes of which you were convicted and sentenced in this case: Murder, second degree; unlawful possession of a firearm

6.  (a) What was your plea? (Check one)

    ☑ (1)   Not guilty                ☐ (3)   Nolo contendere (no contest)

    ☐ (2)   Guilty                    ☐ (4)   Insanity plea

AO 241 (Rev. 09/17)

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to? N/A

(c) If you went to trial, what kind of trial did you have? (Check one)

    ☑ Jury   ☐ Judge only

7.   Did you testify at a pretrial hearing, trial, or a post-trial hearing?

    ☐ Yes   ☑ No

8.   Did you appeal from the judgment of conviction?

    ☑ Yes   ☐ No

9.   If you did appeal, answer the following:

(a) Name of court:   Massachusetts Appeals Court

(b) Docket or case number (if you know):   17-P-0234

(c) Result:   Judgments affirmed

(d) Date of result (if you know):   9-19-2019

(e) Citation to the case (if you know):   96 Mass App Ct 105, 132 N.E.3d 1067

(f) Grounds raised:   I. Deprivation Of Sixth Amendment Right To Unbiased Jury

II. Constitutionally Insufficient Evidence Of Knowledge Of Use Of Firearm By Co-venturer and Of Maximum Penalty For Predicate Felony

III. Prosecutor Argued Facts Not Supported By Evidence Regarding Defendant's Knowledge That Codefendant Was Armd

IV. Constitutionally Insufficient Evidence Of Firearm Offence

V. Codefendant's Testimony Suggested Police Had Evidence Of Guilt That Was Not Presented

(g) Did you seek further review by a higher state court?   ☑ Yes   ☐ No

If yes, answer the following:

(1) Name of court:   Massachusetts Supreme Judicial Court

(2) Docket or case number (if you know):   FAR-27111

(3) Result:   Review Denied

AO 241 (Rev. 09/17)

        (4) Date of result (if you know):    12-23-19

        (5) Citation to the case (if you know):    None

        (6) Grounds raised:    I. Constitutionally Insufficient Evidence Of Maximum Penalty For

            Predicate Felony

            II. Constitutionally Insufficient Evidence That Defendant Knew Codefendant Was Armed

            III. Violation Of Right To Unbiased Jury Was Not Harmless Beyond A Reasonable Doubt

(h) Did you file a petition for certiorari in the United States Supreme Court?    ☑ Yes    ❏ No

    If yes, answer the following:

        (1) Docket or case number (if you know):    19-8088

        (2) Result:    Cert. denied

        (3) Date of result (if you know):    5-26-2020

        (4) Citation to the case (if you know):    140 S.Ct. 2813

10.    Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?    ❏ Yes    ☑ No

11.    If your answer to Question 10 was "Yes," give the following information:

    (a)    (1) Name of court:

        (2) Docket or case number (if you know):

        (3) Date of filing (if you know):

        (4) Nature of the proceeding:

        (5) Grounds raised:

        (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

        ❏ Yes    ❏ No

    (7) Result:

AO 241 (Rev. 09/17)

(8) Date of result (if you know):

(b) If you filed any second petition, application, or motion, give the same information:

    (1) Name of court:

    (2) Docket or case number (if you know):

    (3) Date of filing (if you know):

    (4) Nature of the proceeding:

    (5) Grounds raised:

    (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

    ❏ Yes    ❏ No

    (7) Result:

    (8) Date of result (if you know):

(c) If you filed any third petition, application, or motion, give the same information:

    (1) Name of court:

    (2) Docket or case number (if you know):

    (3) Date of filing (if you know):

    (4) Nature of the proceeding:

    (5) Grounds raised:

AO 241 (Rev. 09/17)

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes     ☐ No

(7) Result:

(8) Date of result (if you know):

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition:     ☐ Yes     ☐ No

(2) Second petition:   ☐ Yes     ☐ No

(3) Third petition:     ☐ Yes     ☐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

12.   For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground. Any legal arguments must be submitted in a separate memorandum.

**CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

**GROUND ONE:** The Evidence Was Constitutionally Insufficient To Establish The Elementary Fact That The Predicate Felony Was Punishable By Less Than A Maximum Of Life Imprisonment

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

See Addendum A.

(b) If you did not exhaust your state remedies on Ground One, explain why:

AO 241 (Rev. 09/17)

(c)     **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?          ☑ Yes     ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?
        ☐ Yes     ☑ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?          ☐ Yes     ☐ No
(4) Did you appeal from the denial of your motion or petition?          ☐ Yes     ☐ No
(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?          ☐ Yes     ☐ No
(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

Petitioner has not filed a state motion for post-conviction relief.

AO 241 (Rev. 09/17)

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One:

**GROUND TWO:**          The Evidence Was Constitutionally Insufficient To Support A Verdict That Petitioner Knew His Codefendant Was Armed

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

See Addendum B

(b) If you did not exhaust your state remedies on Ground Two, explain why:

(c)      **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?          ☑ Yes          ☐ No

(2) If you did <u>not</u> raise this issue in your direct appeal, explain why:

(d)      **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes      ☑ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

AO 241 (Rev. 09/17)

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?  ☐ Yes  ☐ No

(4) Did you appeal from the denial of your motion or petition?  ☐ Yes  ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?  ☐ Yes  ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

Petitioner has not filed a motion for state post-conviction relief.

(e)   **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two :

**GROUND THREE:**   The Violation Of Petitioner's Sixth Amendment Right To An Unbiased Jury Was Not Harmless Beyond A Reasonable Doubt

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

See Addendum C

AO 241 (Rev. 09/17)

(b) If you did not exhaust your state remedies on Ground Three, explain why:

(c)     **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?     ☑ Yes     ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:

(d)     **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes     ☑ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?     ☐ Yes     ☐ No

(4) Did you appeal from the denial of your motion or petition?     ☐ Yes     ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?     ☐ Yes     ☐ No

(6) If your answer to Question (d)(4) is "Yes." state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

AO 241 (Rev. 09/17)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

Petitioner has not filed a motion for state post-conviction relief.

(e)      **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three:

**GROUND FOUR:**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(b) If you did not exhaust your state remedies on Ground Four, explain why:

(c)      **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?        ❏    Yes        ❏    No

(2) If you did not raise this issue in your direct appeal, explain why:

(d)      **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

❏    Yes        ❏    No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

AO 241 (Rev. 09/17)

Name and location of the court where the motion or petition was filed:


Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):


(3) Did you receive a hearing on your motion or petition?               ❏   Yes      ❏   No

(4) Did you appeal from the denial of your motion or petition?          ❏   Yes      ❏   No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ❏   Yes      ❏   No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:


Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):


(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:


(e)      **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Four:

AO 241 (Rev. 09/17)

13.     Please answer these additional questions about the petition you are filing:

(a)     Have all grounds for relief that you have raised in this petition been presented to the highest state court

having jurisdiction?     ☑ Yes          ☐     No

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not

presenting them:

(b)     Is there any ground in this petition that has not been presented in some state or federal court?  If so, which

ground or grounds have not been presented, and state your reasons for not presenting them:

14.     Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction

that you challenge in this petition?          ☐     Yes     ☑ No

If "Yes," state the name and  location of the court, the docket or case number, the type of proceeding, the issues

raised, the date of the court's decision, and the result for each petition, application, or motion filed.  Attach a copy

of any court opinion or order, if available.

15.     Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for

the judgment you are challenging?          ☐     Yes     ☑ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues

raised.

AO 241 (Rev. 09/17)

16.     Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing:   Joan M. Fund, Esq.

(b) At arraignment and plea:   Same

(c) At trial:   Same

(d) At sentencing:   Same

(e) On appeal:   John M. Thompson, Esq.

(f) In any post-conviction proceeding:   NA

(g) On appeal from any ruling against you in a post-conviction proceeding:   NA

17.     Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?     ☐ Yes   ☑ No

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?     ☐ Yes   ☐ No

18.     TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

NA

AO 241 (Rev. 09/17)

---

\* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

      (1)      A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody  pursuant to the judgment of a State court.  The limitation period shall run from the latest of -

              (A)      the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

              (B)      the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

              (C)      the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

              (D)      the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

AO 241 (Rev. 09/17)

(2)    The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief: Vacate the judgments of conviction, order entry of acquittal on both indictments and discharge from custody.

or any other relief to which petitioner may be entitled.

/s/ John M. Thompson

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on _____ (month, date, year).

Executed (signed) on _____ (date).

Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

Counsel for Petitioner, who cannot conveniently sign before petition must be filed to be timely.

Page 16 of  16

ANTONIO RODRIGUES v. MICHAEL RODRIGUES
PETITION FOR RELIEF FROM A CONVICTION OR SENTENCE
BY A PERSON IN STATE CUSTODY
28 U.S.C. §2254

ADDENDUM A

GROUND ONE

**THE EVIDENCE WAS CONSTITUTIONALLY INSUFFICIENT TO ESTABLISH THE ELEMENTARY FACT THAT THE PREDICATE FELONY IN PETITIONER'S FELONY-MURDER CONVICTION WAS PUNISHABLE BY A MAXIMUM OF LESS THAN LIFE IMPRISONMENT**

### 1. Synopsis.

An element of second degree felony-murder is the fact that the alleged predicate felony of armed assault with intent to rob is punishable by a maximum penalty of less than life imprisonment. The jury was instructed that this is an element that it was required to find beyond a reasonable doubt. No evidence was presented regarding this alleged fact. The judge instructed the jury that, as a matter of law, the penalty for armed assault with intent to rob is less than life imprisonment. She also instructed them that they were bound to follow and apply her instructions on the law, without exception.

### 2. Statement Of Facts.

Petitioner Antonio Rodrigues was convicted of second degree felony-

1

murder in the November 23, 2013 shooting death of Sharone Stafford. An essential element of this offense is the factual proposition that the unlawful killing occurred during the commission of a felony that is punishable by a maximum sentence of less than life imprisonment. See, *Commonwealth v. Christian*, 430 Mass 552, 558 (2000)["A conviction of felony-murder in the second degree requires the jury to find that (1) the defendant committed or attempted to commit a felony with a maximum sentence of less than imprisonment for life, (2) a killing occurred during the commission or attempted commission of that felony, and (3) the felony was inherently dangerous or the defendant acted with conscious disregard for the risk to human life"].

The only felony presented to the jury to serve as a predicate for the second degree felony-murder charge on which he was convicted was armed assault with intent to rob, codified in Mass. Gen. Laws c. 265, §18(b), which states: "Whoever, being armed with a dangerous weapon, assaults another with intent to rob or murder shall be punished by imprisonment in the state prison for not more than twenty years."

The only information presented to the jury regarding the fact of the maximum penalty for armed assault with intent to rob was the following jury instruction:

2

To prove the defendant guilty of felony murder in the second degree the Commonwealth must prove the following elements beyond a reasonable doubt. Number one, the defendant knowingly participated in the commission or attempted commission of a felony with a maximum sentence of less than life imprisonment. Second, that death occurred during the commission or attempted commission of the felony. Third, the felony was inherently dangerous or the defendant's knowing participation in the felony was with a conscious disregard for the risk to human life.
* * *
The first element, in felony murder in the second degree differs from felony murder in the first degree in that with felony murder in the second degree the Commonwealth must prove that the defendant committed to attempted (sic) to commit a felony with a maximum sentence of less than imprisonment for life. The Commonwealth alleges that the defendant knowingly participated in the commission of the crime of armed assault with intent to rob. **I instruct you that this crime is a felony with a maximum sentence of less than life imprisonment**. In order for you to decide whether the crime of armed assault with intent to rob actually occurred in this case I must instruct you on the elements of this offense.

X:115-116 [emphasis added]. The jury was also instructed that it was the sole judge of the facts, and was required to make its factual findings "solely and entirely on the evidence as you have heard it and seen it in this courtroom and on what you observed during the view and on nothing else." X:78. The judge instructed that the jury was bound without exception to accept and apply the law as the judge gave it to them in the instructions. X:79-80. The judge instructed that her instructions were not evidence. X:95.

3

ANTONIO RODRIGUES v. MICHAEL RODRIGUES
PETITION FOR RELIEF FROM A CONVICTION OR SENTENCE
BY A PERSON IN STATE CUSTODY
28 U.S.C. §2254

ADDENDUM B

GROUND TWO

**THE EVIDENCE WAS CONSTITUTIONALLY INSUFFICIENT TO
SUPPORT A FINDING BEYOND A REASONABLE DOUBT THAT
PETITIONER KNEW HIS CODEFENDANT WAS ARMED**

**1. Synopsis.**

The Commonwealth's theory was that on November 23, 2013, Hailton DaCosta, Samir Baptista, Elito Mendes and Antonio Rodrigues made and carried out an impromptu plan to rob Sharone Stafford, a local cocaine dealer who was supposedly a competitor.[1] In the course of attempting that robbery DaCosta shot and killed Stafford. Rodrigues's defense was that, although he was with the others *at times* during the period that they made their plan, Rodrigues did not know that the others intended to use a gun. Further, the shooting was not part of the joint

---

[1] There was evidence that DaCosta, Mendes and Rodrigues sold narcotics together, and that Baptista frequently bought from them. Little direct evidence of the nature of DaCosta's, Mendes's and Rodrigues's association was presented, and little was presented regarding Baptista's association with the other three.

venture to commit an unarmed robbery; rather, it was an independent act by Baptista, who within an hour of the killing confessed separately to two individuals, that he had killed Stafford. Baptista had a grudge against Stafford at that time that did not involve Rodrigues, Mendes or DaCosta. VIII:85-87, 199.[2]

The Commonwealth presented its theory primarily through the testimony of Baptista and Mendes. It contracted with each, compensating him with reduced charges and lenient sentencing recommendations for his testimony. III:176; V:123,137;VI:152; VIII:143-144, 195; Exs. I, S and T for Identification]. Rodrigues presented his defense through cross-examination of Commonwealth witnesses.

**2. The Evidence**.

In the Commonwealth's account, the entire scheme was loosely formulated in the late evening of November 23, 2013, and carried out around midnight. The prosecution's two contract witnesses, Elito Mendes

---

[2]

References to the trial transcript follow this convention:
November 9, 2015 transcript is "I:page"; November 10, 2015 transcript is "II:page"; November 12, 2015 is "III:page"; November 13, 2015 is "IV:page"; November 16, 2015 is "V:page"; November 17, 2015 is "VI:page"; November 18, 2019 is "VII:page"; November 19, 2015 is "VIII:page"; November 20, 2015 is "IX:page"; November 23, 2015 is "X:page"; November 24, 2015 is "XI:page"; November 25, 2015 is "XII:page."

and Samir Baptista each testified how they and the two defendants, Antonio Rodrigues and Hailton DaCosta, agreed to and attempted the robbery during which DaCosta killed the victim. Some details were disputed, but Mendes and Baptista both agreed that everything occurred within a short time that night. Mendes said Baptista came up with the idea of robbing drug dealers to put them out of business; Baptista said DaCosta and Rodrigues did. But on the essentials, the two agreed: [1] the robbery that the four attempted was a last-minute affair in which there was no clear agreement concerning who was to do what; and [2] only Mendes and DaCosta knew that DaCosta was armed when the attempt was made.

### 3. Baptista The Point Man.

Samir Baptista chose the robbery victim and arranged the time and place of the rendezvous with the victim. He claimed he was unarmed at the time; he was present with the victim when the victim was shot, and he searched the victim unsuccessfully for drugs, then stole the victim's cell phone after the shooting. Later that night he told two acquaintances that he had just shot someone and was distressed at what he had done. He testified under a written contract with the prosecution that promised him leniency in exchange for cooperation.

6

Baptista's account of his activities on November 23, was convoluted and contradictory.  It is not possible to map out an accurate chronology from his account.[3]

Baptista was the unemployed father of four children under the age of ten who spent much of his time consuming crack, marijuana, and alcohol. V:78-80. He stole merchandise and sold it for drug money, and brokered drug deals in exchange for a share of the transacted drugs. V:82-83, 174-175. He claimed he had known Rodrigues and DaCosta for about five years before the events at issue. V:85-86. Baptista claimed that, about a week before November 23, 2013, Rodrigues told him that he wanted to get other drug dealers off the streets by robbing them. No evidence was presented to put this alleged statement into context. V:87-88.

**4. Discussions of the Proposed Robbery.**

Mendes said that, around 10:30-11:00 p.m., Baptista approached

---

[3]

Baptista's testimony, given in English [which was not his primary language, V:78] without an interpreter, was rambling and often difficult to decipher, as the judge commented several times. E.g., V:90 ["I'm having an awful hard time understanding what you're saying"]. For example, when identifying Rodrigues and DaCosta in court [he said he'd known each for about five years] he said he knew each one by the same Creole nickname – "Zico." V:80-81.

Mendes and DaCosta, who were sitting in a car in the parking lot at the Portuguese Sports Club. VIII:86-87, 170-175. Baptista proposed that they rob a drug dealer who had sold Baptista bad crack; Rodrigues was not present. VIII:82-87, 170-175. Baptista said Rodrigues was present, and that DaCosta, Rodrigues and Mendes urged Baptista to join them in robbing a dealer. V:90-91. No agreement was reached then. Baptista bought some crack from Rodrigues and left to share it with the man for whom he had procured it, in exchange for a share of the drug. V:82-83, 174-175.

A second conversation occurred inside the Club after 11:00 p.m., where Mendes said Rodrigues joined the other three. Mendes described a conversation then among the four in which they agreed that Baptista was going to set up a meeting with a dealer as if to buy drugs and then, instead of the transaction, "there were going to join in," meaning "we're going to rob." VIII:88-89. Mendes said Rodrigues "pretty much said okay." Id:89. To the extent this foray was planned, Mendes said the plan was simply to rob Stafford, without any agreement on whether it would be an armed robbery or an unarmed "strong-arm" robbery. VIII:89,190, 200 ["we had a plan just to go rob the dude"].

Mendes testified that, beyond agreeing that they were going to rob

8

Stafford, the group had no plan. Id:200. DaCosta never described how the robbery was going to be carried out; Rodrigues, Mendes and Baptista did not discuss that detail either. VIII:190.

Several hours earlier, DaCosta and Mendes had brought a gun to the Portuguese Sports Club, but Baptista testified he did not see it or hear any talk about it. VI:143-145.

Baptista testified that he spent the day buying and smoking crack, making two purchases from Rodrigues, as well as other transactions with other people[4]: "Two times I got it from [Rodrigues], but we had an argument and he said to go see [DaCosta] at the Portuguese Bar.[5] VI:173. This is consistent with Mendes's testimony that Rodrigues was not present for this meeting.

Mendes, the other co-venturer who testified for the Commonwealth,

---

[4]

Sometime that day or evening, Baptista stole $30-40 worth of tuna and sold it for money to buy more drugs. VI:170-175.

[5]

The first drug transaction with Rodrigues was on Delano Street and the second was on Division Street. Baptista said that, in the interim, "Josh" had picked him up that day around 3 p.m. The transaction with DaCosta was in the parking lot of the Portuguese Sports Club, apparently when Baptista first spoke with DaCosta and Mendes about robbing a drug dealer around 11:00 p.m. that night. VI:172.

confirmed that *Rodrigues was not present* when he and DaCosta first met Baptista at the Club. VIII:85 ["Me and (DaCosta) was in the car and then (Baptista) walked up to us, then we started talking"], Id:222-223 ["Q (Rodrigues's attorney): Okay. All right. And the first discussion of this was in the car with DaCosta, yourself, and Baptista, right? A:Yes.  Q: Okay. My client wasn't there then, right? A. No."].

Baptista took the crack from Mendes and DaCosta and left. VI:174-175. Baptista testified that around 10:30 p.m., he brokered a drug deal for another person who gave some of the drugs to him in exchange, and dropped him off at 10:30 p.m. VI:170-175. He returned to the Portuguese Sports Club around 11 p.m. Id: 174-175.

**5. Baptista Selects The Robbery Victims.**

There in the parking lot meeting with DaCosta and Mendes, Baptista told them about a dude that ripped him off one time by selling him bad crack. This prompted a conversation among the three about keeping that guy "off the area." VIII:85-87.  According to Baptista, DaCosta told Baptista that he and Mendes wanted to get other drug dealers off the street by robbing one. VI:169-170.

Baptista said that, at that point, he agreed to help Mendes and DaCosta by showing them where the drug dealers were. Id; V:91. After

10

the three agreed that Baptista would call a drug dealer, they went inside the Portuguese Sports Club and Rodrigues joined them there. VIII:87. Baptista called a dealer named Joshua, but Joshua told Baptista he was too afraid to meet with him. Id:92.     Baptista then called Stafford from the bathroom of the Portuguese Sports Club [V:95], using Mendes's cell phone [V:161], and asked for an eight-ball.[6]

Stafford directed Baptista to meet him near Tony's Bar in the area of Winsor Street. Baptista said he "always" bought cocaine and heroin from Stafford, and they usually met either at Baptista's house or near Tony's, more commonly at Tony's. VI:184-185. In their dealings, Stafford sometimes had a car and sometimes did not. Id. Baptista rejoined the other three and had Rodrigues give him $75 to show to Stafford; they did not discuss the amount. V:96. Baptista was not asked whether, to his knowledge, Stafford carried a gun when doing his drug business.[7]

### 6. **DaCosta And Mendes Surreptitiously Bring In DaCosta's Gun.**

After Baptista arrived around 11:00 p.m., Mendes left and walked

---

[6]

Thus Baptista selected both prospective robbery victims. V:197.

[7]

Stafford's mother spoke at sentencing, declaring: "He never toted a gun. He never toted a gun." XII:15.

to some nearby projects to sell some crack, returning about five minutes later. VIII:90. Earlier, DaCosta had arranged for an associate, "Chris," to deliver a firearm to the Portuguese Sports Club parking lot. On Mendes's way back to the Club, DaCosta texted him that "the kid had already bring the gun." Id:91. The car Mendes was driving was parked in a Club parking lot. On DaCosta's instructions, Mendes detoured to his car and unlocked the trunk, where Chris then hid the gun [Mendes said the gun belonged to DaCosta. VIII:95]. Mendes rejoined the other three in the club. VIII: 95.

Shortly, Stafford called back for Baptista; DaCosta passed the phone to him. Baptista went into the men's bathroom where he spoke with Stafford, whom Baptista referred to as "Moss." VIII:99. Baptista told the others that Stafford would be driving one of two cars and that the meeting place was in front of Tony's Bar. VIII:99.  Stafford called again and spoke to Baptista; the four then left together to meet Stafford on Winsor Street. VIII:100-101.

### 7. The Attempted Robbery Implodes.

As Baptista and Rodrigues got into the right and left rear seats, Mendes opened the trunk and DaCosta took the gun, concealing it on his person. VIII:101-102. The four then drove in Mendes's Nissan Sentra to

the Winsor Street area that Stafford had designated as the meeting place. VI:184-185. Baptista instructed Mendes to drop him off in front of the Ihla Verde so that Stafford would think he was alone. VIII:102-103.

Mendes said he then drove past the meeting site, where he saw Baptista and Stafford standing outside Stafford's VW on opposite sides of the car. Mendes turned around and parked on the opposite side of the street a short distance away. VIII:103-104. Meanwhile, according to Baptista, he and and Stafford had met on the street, crossed to Stafford's VW and got in. They spoke briefly, but Baptista said Stafford noticed Mendes's car and started "acting paranoid," telling Baptista that he had a gun and ordering him out of the car; Baptista complied. V:102-104. Baptista testified that  DaCosta got out and ran toward the VW on the driver's side. He opened the door; Stafford closed it and DaCosta fired two shots through the driver's window glass. V:104-105. Baptista was then standing on the sidewalk. V:191.

Mendes said that Rodrigues got out of Mendes's car and moved briefly toward Stafford's VW but retreated when the shots were fired. VIII:203. Baptista said he did not see Rodrigues leave Mendes's car. VI:153. Baptista said he did not see a gun at all that evening. VI:143-147; 161-162.

13

After DaCosta shot him, Stafford's car moved forward about 100 yards [Ex. 15], struck an obstacle and stopped. V:106-107. Mendes, DaCosta and Rodrigues drove away in the Sentra.[8] VIII:106-107. Baptista went to the VW, finding the driver's door was open. Near by, Stafford lay face down on the street. Baptista searched the car for drugs but found none; he took Stafford's cell phone. V:107, VI:163.

Mendes, DaCosta and Rodrigues drove back to the Portuguese Sports Club. As Rodrigues walked toward the club, DaCosta and Mendes transferred the gun from the Sentra to DaCosta's car. VIII:109-110. Inside, DaCosta explained that he shot Stafford because Stafford tried to take his gun away. VIII:111-112.

### 8. Baptista Repeatedly Incriminates Himself As The Shooter.

Meanwhile, Baptista began a bizarre odyssey. He crossed to the Ihla Verde, where he began to drink and told a man named Waldir Correia that he had just shot somebody. V:108-109; IX:157-160. He moved to the Portuguese Sports Club, where he borrowed the bartender's phone and called Rodrigues, who told him the other three were at a house on

---

[8]

Outside Tony's bar the owner saw the Nissan Sentra drive toward him, made a note of the license number, and promptly notified police. IV:80-85.

Division Street.  There, Baptista and DaCosta quarreled over the shooting and disputed whether Stafford had actually been shot; DaCosta threatened Baptista and his family if Baptista said anything. Baptista showed the phone he had taken; DaCosta grabbed it and smashed it on the floor. V:114-115; VIII:117. Baptista returned Rodrigues's money to him. VIII:116. Shortly, Mendes and DaCosta left for Fall River and Rodrigues left in his own car. VIII:117-118.

Baptista walked from the Division Street house to a Hess gas station that he had frequented before. He bought blunts for smoking weed and crack, and told the attendant that he had just shot someone. V:116; VI:61, 100, 169-170. He said he "couldn't believe what he had done and he needed someone to talk to." He continued: "I just shot this guy and I don't know what I'm supposed to do." VI:63. He said he shot the guy twice in the leg and once elsewhere, maybe with a shotgun. VI:64, 70-71. He added that the guy got back into his car and ran it into a pole or tree, and that he [Baptista] went back to see the man's dead body; he told the attendant not to tell anyone what he had told her. The attendant thought Baptista was high at the time. VI:64, 66-67.

Baptista returned to the Division Street house, smoked a blunt and went back to the crime scene, where the police investigation had begun.

15

V:117-118; VI:100-101. Investigators saw him pacing to and fro, repeating: "I can't believe this happened." VI:116, 118. Questioned, Baptista told police he had information about the shooting and was taken in for interrogation. V:118-119; VI:101.

During hours of interrogation, Baptista told police:"Zico shot my boy [referring to Shepard]." From an array, he identified DaCosta as Zico. V:120;VI:41,44,49. In the seven-hour interrogation up to that point, Baptista had refused to admit his role until police told him that it looked like he was the shooter. VI:131-132. Then he accused DaCosta of the shooting.  Battista claimed that DaCosta gave him the drug money [first he said it was $10 for weed, then $200] and that Shepard took it. VI:155-157. He lied that there were four men in Mendes's car in addition to himself, and that the others chased him. VI:159.

Before accusing DaCosta, Baptista told the police he didn't know who fired the gun, and lied that the shooter dropped it at the scene. V:129-131;VI:131, 162. Once he identified DaCosta as the shooter, he fingered Mendes as the driver, but said nothing about Rodrigues. VI:45, 120. He did not mention Rodrigues until five months later when he testified in the grand jury in April 2014. V:149-153, 184-187.

In trial, Baptista was challenged to explain why he had waited so

16

long to accuse Rodrigues. Under cross-examination, Baptista said he

accused Rodrigues because the police "brought me the paper and said he

was there. He really was so." VI:152-153. On redirect, the following

exchange occurred:

> Q. Why did you have him involved later and not in the beginning?
> A. Because the police brought the paper, I seen it. Q. The police
> brought what? A. They brought the paper. Q. What paper? A. I
> seen that video, I seen a paper saying that he – MS. FUND
> [defense counsel]. I'm going to object, your Honor. Q. I'm going
> to withdraw it, your Honor. THE COURT: Okay.

VII:184. At side bar, the judge said it sounded like Baptista was saying

that the police had shown evidence of Rodrigues's guilt, and the

prosecutor agreed:

> THE COURT: What paper? It sounds like the police put in
> some kind of evidence that Mr. Rodrigues was involved, so that's
> what it sounds like. MR. COLLINS [prosecutor]: That's what it
> sounds like, but it didn't happen. I was there.

VII:185.    Nothing corrective was done. VII:185-188.

### 9. Prior Knowledge That A Participant Was Armed With A Gun Was Required.

The jury was instructed that, to convict Rodrigues of felony-murder,

they had to find that he knew that one of his coventurers was armed.

During deliberations, the jury asked for clarification as to whether he had

to know that *before the armed assault occurred*; the judge and all counsel

agreed that Rodrigues had to know before the crime occurred and the judge gave that instruction. XII:5-7 11-25-15:5-7.

ANTONIO RODRIGUES v. MICHAEL RODRIGUES
PETITION FOR RELIEF FROM A CONVICTION OR SENTENCE
BY A PERSON IN STATE CUSTODY
28 U.S.C. §2254

ADDENDUM C

GROUND THREE

**THE APPEALS COURT'S DETERMINATION THAT THE TRIAL JUDGE'S SIXTH AMENDMENT ERROR IN FAILING TO CONDUCT AN INDIVIDUAL VOIR DIRE OF JURORS WHO HAD BEEN EXPOSED TO EXCLUDED EVIDENCE DURING DELIBERATIONS WAS HARMLESS BEYOND A REASONABLE DOUBT WAS BASED ON UNRELIABLE FACT FINDING METHODS AND IS CONTRARY TO THE SUPREME COURT'S HOLDING IN CHAPMAN V. CALIFORNIA. THE JURY'S EXPOSURE WAS NOT HARMLESS.**

**1. Synopsis.**

During trial, the judge excluded the Commonwealth's proffer of an audio-visual recording of a brief conversation that its contract witness Baptista had with a bartender minutes after the murder.  The duration of the recording clip was 30 seconds or less. In it, Baptista can be heard to say that there had been a shooting outside and that he was not the shooter. The judge admitted the video but excluded the audio on the ground that the self-exculpatory portion was harmful to Petitioner Rodrigues's defense. The prosecutor was instructed to redact the exhibit to exclude the audio but did not do that. Consequently the jury played the

19

audio recording during its deliberations and discussed the clip. Realizing that it had not heard the audio in the courtroom, it reported the matter to the judge. The judge brought the foreperson into the courtroom and questioned him about what the jury heard without putting him under oath. Based solely on what the foreperson reported, the judge decided to simply instruct the jury to disregard whatever it was that they heard on that clip.

The Commonwealth conceded that this was a Sixth Amendment error and the Appeals Court agreed, but found the error to be harmless under Chapman v. California. The Appeals Court based that assessment on a finding that the jury had only heard Baptista tell the bartender that there had been a shooting outside, and found that, because this was cumulative of other admissible evidence, it was harmless.

The Appeals Court did not base its *Chapman* assessment on the whole trial record. It ignored other statements by the foreperson, other record evidence, and a concession by the Commonwealth, all indicating that the jury had heard Baptista's statement to the bartender that he was not the shooter. Baptista had, shortly after the murder, made two statements to other civilians declaring that he had just shot someone; he reported each to the police during his interrogation. The first, which

20

Baptista made around 12:30 a.m., was presented at trial in the testimony of Det. Fonseca about his notes of an interview with Waldir Correia, to whom Baptista said he confessed. VI: 100, 136; IX:156-163. The second, to Christina Hooper, a Hess gas station attendant, was presented in detail through Ms. Hooper's testimony. VI:59-76.

The contested video clip had been offered by the Commonwealth as a prior statement, made before his confessions, and consistent with his trial testimony. The judge had specifically excluded it as harmful to the defense that Baptista had shot the victim while acting independently of the unarmed robbery joint venture.

## 2. Facts Pertinent To This Claim.

A little more than an hour after Stafford was shot, Baptista entered a bar and borrowed bartender Laura Costa's phone, telling her that someone had just been shot outside and that he wasn't the shooter. That conversation was capured by an audio-video camera inside the club. VI:66. In trial, the Commonwealth proposed to play that recording as a prior consistent statement. VI:67, 71-72. The judge excluded the audio saying:

> The harm in offering the audio is where your star witness denies shooting someone. I can see where that's harmful to the defendant and they might not want it in(.)

21

VI:67. She admitted the video *de bene* as Ex. 36, ordering the prosecutor to substitute an audio-free copy before the exhibits were finalized. VI:74. The prosecutor never complied. XI:8-9, 13-14.. He later offered an audio-free video clip of the same exchange that was admitted as Ex. 65.

On the second day of deliberations, the jury notified the court that it had heard audio on Ex. 36:

> Exhibit 36 – Port. Sports Club.
> In the courtroom, only video was presented, we just found it to have "audio."
> Is there any "issue" with us "listening" to this video?
> For the same matter, will this apply to any other exhibits in our possession?

Ex. Z for Identification, A.22.[9]

The judge responded by having the foreperson turn Ex. 35 over to the court; after she and the lawyers played it three times[10] they determined two things: [1] that, at 13 seconds [XI:9], and again at 22 [XI:12] seconds, Baptista talked about the shooting; and [2] that the recorded conversation occurred before Baptista had confessed to the Hess gas station attendant at 1:30 a.m. that he had recently shot someone.

---

[9] "A.page" refers to the Appendix to Petitioner Rodrigues's Appeals Court opening brief.

[10] If the disc had been left in the player untouched it might have been possible to determine the exact point at which it had been stopped.

22

The significance of that timing is that the Hess attendant had testified extensively about Baptista's confession to her. XI:12. The judge decided that she needed to determine how much of the audio recording the jury had heard. Rejecting both the prosecutor's and defense counsel's request for an individual voir dire of the jurors, she summoned the foreperson for questioning.[11]

No one objected to the foreperson testifying without being sworn. XI:15. The judge and the foreperson had the following exchange:

> THE COURT: [H]ow much of the audio did you hear?
> FOREMAN: We just heard Baptista say someone shot someone outside. That's all we heard and we stopped it because we didn't hear that in here.
> THE COURT: Okay, again, I appreciate you folks understanding that was an issue and stopping it at that moment. So, you didn't hear anything before it or after?
> FOREMAN: That's exactly what we heard.
> THE COURT: So do you have any idea what time you stopped it?
> FOREMAN: We only heard just that and I asked what time it was, what time it was said and then we all brought up the issue with it.
> THE COURT: Okay, do you remember what – how did you

---

[11] Defense counsel insisted she heard Baptista responding to being asked if he shot: "No, no I didn't shoot someone." XI:9. The prosecutor proposed "to inquire of the jury(.)" XI:10. Defense counsel: "The other alternative would be to ask them individually and I thin that would be more appropriate. I think as much as the foreman might be able to say, well, it was shut off as soon as we figured out it had audio, he's not in a position to determine what anybody else heard." XI:10

figure out what time it was said, was it on the –
    FOREMAN: I asked for the time on the clip.
    THE COURT: And what time did they say?
    FOREMAN: It was one something.
    THE COURT: So you weren't really exactly sure?
    FOREMAN: Right, no, not exactly.
    THE COURT: You're confident that as soon as you heard somebody shot somebody out there —
    FOREMAN: We stopped it. Because we didn't hear it in here.
    THE COURT: Very good, thank you very much. I'm very appreciative that you were that attentive (sic) to it. I have taken back just to check to make sure there is no audio on 64 and 65 so I will return them presently. So, you can go back to the jury deliberation room. Thank you.
    FOREMAN: Thank you.
**FOREMAN EXITS COURTROOM**

XI:15-17.

The judge had just listened to the recording and commented that the first thing she heard was Baptista asking to use the bartender's phone, so she knew that the foreperson's memory was not accurate. In its brief responding to DaCosta's opening brief, the Commonwealth conceded that the jurors heard Baptista say that "someone had been shot, and that he was not the shooter." Commonwealth v. Hailton DaCosta, Appeals Court No. 2017-P-0201, Commonwealth's Brief, p. 18.

DaCosta's appellate attorney represented to the Appeals Court in his opening brief that she listened to Ex. 36 and heard the following:

    Baptista: Hey can I use your phone . . .
    Bartender: Yeah.

24

Baptista: . . . for a second please? Some niggas just got shot in the street.
Bartender: Don't tell me that shit, are you serious?
Baptista: These fucking niggas got shot I guess.
Bartender: Don't tell me that. What? You shot him?
Baptista: I didn't shoot nobody.
Bartender: I don't want to know this. I don't want to know.

Commonwealth v. Hailton DaCosta, Appeals Court No. 2017-P-0201, *Brief for the Defendant On Appeal From The Bristol County Superior Court*, p. 21 n.5 [December 2017].[12]

The foreman's first response to the judge's inquiry said that the jurors had heard only one statement: that someone had been shot outside. But the judge's account of what she heard, and DaCosta's account of what he heard, put that statement in the middle of the seconds-long colloquy Baptista had with the Bartender, and the latter account has Baptista denying that he was the shooter came just two dozen words after the statement the foreperson heard and *directed someone else* to shut off the player.

The foreperson's report conveyed even more critical information that demanded made individual voir dire of the jurors indispensable to

---

[12]

Petitioner Rodrigues asked the Appeals Court to obtain Ex. 36 from the Superior Court and listen to it. Commonwealth v. Antonio Rodrigues, Appeals Court No. 2017-P-0234, *Brief and Appendix For Appellant Antonio Rodrigues*, p20 n. 12 [August 2018].

learning what each had heard and whether the judgment of any one of them had been affected: the jury discussed Baptista's statement to place it in context vis-a-vis his confession to the Hess attendant. The judge and lawyers had done exactly the same thing because they understood the relevance of the prior consistent statement. Evidently the jurors did too, and their discussion constituted deliberations over the significance of that inadmissible, extrinsic information.

The Appeals Court was presented with this additional evidence regarding the jury's exposure to extrinsic non-evidence, but did not acknowledge or discuss any of it. The Court's harmless beyond a reasonable doubt ruling was this:

> It is undisputed in this case, **the judge did not conduct individual voir dire to determine precisely what each juror heard and whether it affected his or her impartiality**. The Commonwealth concedes this as error. Because the error implicates the defendant's rights under the Sixth Amendment to the United States Constitution to trial by an unbiased jury, we must determine whether the error was harmless beyond a reasonable doubt.
>
> * * *
>
> First, Baptista's recorded statement that "[s]omebody got shot down the street" did not prejudice the defendants because that statement was cumulative of Baptista's trial testimony, "I spoke to the bartender and told [her] somebody got shot." Thus, that portion of the audio recording did not expose the jury to new information. [citation omitted]  Moreover, the substance of the statement, that someone had been shot, was never a contested issue at trial.  The defendants' suggestion that the jury may also

26

have heard Baptista deny that he was the shooter is not supported by the record. [citation omitted] Our review must "be focused on the jury in this case, not on [what] a hypothetical jury" may have heard. [citation omitted] Simply put, the jury's brief exposure to Baptista's recorded statement that somebody had been shot "could not have tainted [their] verdict," [citation omitted], where the jury had already heard the substance of that statement, the accuracy of the statement was not contested, and the jury also heard eyewitness testimony from two cooperating coventurers.

Second, the judge gave a curative instruction incorporating all of the defendants' suggestions. She instructed the jury in "forceful terms" to strike from their minds "whatever portion of the audio" they heard. We presume the jury followed those instructions. [citation omitted] Finally, we note that although the judge did not adhere strictly to the Jackson protocol, she did, through collective questions, seek to determine how much the jury had heard and whether they could disregard it. These efforts were consistent with Jackson and Blanchard, insofar as they were directed to the scope of the jury's exposure to extraneous matter and its impact. No juror indicated that they heard more than what the foreperson stated they heard, and no juror expressed an inability to disregard that information and remain impartial. Having observed the jury over the course of the ten-day trial, the judge was in the best position to assess the credibility of those responses. [citation omitted] Further, the defendants ultimately declined the judge's offer to conduct individual voir dire when they brought it to her attention a second time. In these circumstances, in the absence of any evidence that the extraneous matter prejudiced the defendants, the judge's denial of the motion for mistrial did not "fall[] outside the range of reasonable alternatives." [citation omitted].

*Commonwealth v. DaCosta*, 96 Mass App Ct 105, 111-112 (2019).

The Appeals Court looked only at the statement "somebody got shot down the street." This is what the judge said she heard the first time she listened to the recording. A.52. The foreman reported "We just heard

27

Baptista say someone shot someone outside." CITE. DaCosta's attorney's account suggests that those accounts used politely cleaned up language for "Some niggas just got shot in the street." More to the point, the record evidence is clear that Baptista said more than "somebody got shot down the street" and, as the Appeals Court conceded, the judge did not make the inquiries that were required: what did each juror hear and how did it affect their impartiality? No reliable harmless error determination can be made without reference to those unestablished facts.

The record demonstrates the jurors discussed this recording to place it into the context of Baptista's other statement on the same subject. The Appeals Court did not consider at all the fact that the jury deliberated the relevance of this extrinsic non-evidence. This effort to determine where in the sequence of what Baptista was saying about the shooting in the immediate aftermath suggests that the jury had heard his self-exculpation and was trying to place it before or after his Hess station confession.  Once the jury's consideration of such material reaches the point of deliberating about it, this information cannot be dismissed as inconsequential.

The trial judge found that the content of the whole of this short recording [less than a minute] was harmful to the defense. The Appeals

28

Court did not consider this finding at all. It did not apply this practical statement in *Chapman*: "An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot, under *Fahy*, be conceived of as harmless." *Chapman v. California*, 368 U.S. 18, 23 (1967).