UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANTONIO RODRIGUES,

     Petitioner,

     v.

MICHAEL RODRIGUES,

     Respondent.

Civil Action No. 21-30059-MGM

MEMORANDUM AND ORDER REGARDING
PETITION FOR WRIT OF HABEAS CORPUS
(Dkt. No. 1)

October 31, 2023

MASTROIANNI, U.S.D.J.

## I.    OVERVIEW

Following a jury trial, Antonio Rodrigues ("Petitioner") was convicted of unlawful possession of a firearm and felony-murder in the second degree, in relation to the shooting death of Sharone Stafford. The predicate felony for the felony-murder conviction was armed assault with intent to rob. Petitioner's convictions were upheld on appeal by the Massachusetts Appeals Court ("MAC") on September 19, 2019, *Commonwealth v. DaCosta*, 132 N.E.3d 1067 (Mass. App. Ct. Sept. 19, 2019), and the Massachusetts Supreme Judicial Court denied his Application for Further Appellate Review on December 23, 2019, *Commonwealth v. Rodrigues*, 137 N.E.3d 1072 (Mass. 2019) (table). The United States Supreme Court denied certiorari on May 26, 2020, *Rodrigues v. Commonwealth*, 140 S. Ct. 2813 (2020).

Petitioner filed the instant Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus on May 20, 2021, arguing (1) there was insufficient evidence to show the predicate felony underlying his murder conviction was punishable by a maximum sentence of less than life imprisonment; (2) there was insufficient evidence to show Petitioner knew one of his co-defendants was armed; and (3) the

trial judge's failure to conduct an individual voir dire to determine the extent of the jury's exposure to certain excluded audio was not harmless. For the reasons explained below, Petitioner's habeas petition is denied.

## II.    BACKGROUND

The MAC recounted the following facts, which this court must presume are correct. *See Hensley v. Roden*, 755 F.3d 724, 727 (1st Cir. 2014).

> 1. The murder. . . . In 2013, [Samir] Baptista regularly used "crack" cocaine purchased on many occasions from the defendants, [Elito] Mendes, and the victim. In the week before the murder, Rodrigues told Baptista that he (Rodrigues) planned to rob other drug dealers to "get the[m] off the streets." On November 23, 2013, Baptista bought cocaine from Rodrigues in the parking lot of the Portuguese Sports Club (club) in New Bedford. At the time, Rodrigues was in Mendes's black Nissan Sentra with Mendes and [Hailton] DaCosta; DaCosta asked Baptista to call drug dealers to help him (DaCosta) with his plan to rob them. Baptista agreed to help later that evening, as the defendants and Mendes continued discussing their scheme to rob drug dealers. Baptista called various dealers and eventually arranged to meet the victim on Winsor Street to purchase cocaine. Rodrigues gave Baptista money so as not to arouse the victim's suspicion.
>
> The defendants, Mendes, and Baptista left the club in the Nissan. Before departing, Mendes and DaCosta retrieved DaCosta's handgun from the Nissan's trunk. They dropped Baptista off near Winsor Street to avoid being seen by the victim.
>
> Baptista walked to Winsor Street, located the victim, and entered his car. As they talked, the Nissan drove by. The victim became suspicious and ordered Baptista out of his car. As Baptista left the victim's car, Mendes parked the Nissan and the defendants got out. DaCosta approached the victim's car and opened the driver's door. After DaCosta and the victim "had words," the victim closed the door and DaCosta shot him twice through the car window. DaCosta ran to Mendes's car, he and Rodrigues got in, and Mendes drove away. Meanwhile, Baptista approached the victim, who lay dead on the street. He searched the victim's car for drugs or money but found none. Baptista took a cell phone and left the area.
>
> After the shooting, the defendants and Mendes returned to the club where Mendes moved the gun from under the passenger seat of the Nissan to DaCosta's mother's car. Inside the club, Rodrigues and Mendes asked DaCosta why he had shot the victim. DaCosta explained that the victim had been trying to take the gun from him. He then physically demonstrated how he shot the victim by raising his right hand parallel to the ground. Meanwhile, Baptista went to a bar after the shooting, then returned to the club to look for Rodrigues. By the time Baptista returned to the club, the defendants and Mendes had left.

Baptista left the club and met the defendants and Mendes on Division Street, where he told them that the victim was dead. DaCosta threatened to kill Baptista and his family if he went to the police. Rodrigues intervened and assured DaCosta that Baptista would remain silent. When Baptista showed them the victim's cell phone, DaCosta took it and smashed it on the ground. Baptista gave Rodrigues his money back. Baptista then went to a Hess gas station where he told the attendant that he had just shot someone with a shotgun. After smoking crack cocaine, Baptista returned to the crime scene, where police officers observed him pacing and saying, "I can't believe this happened." Baptista was taken to the police station where he agreed to cooperate.

Although the murder weapon was never found, two spent projectiles and two shell casings were recovered from the victim's body and the crime scene. A ballistics examination revealed that the projectiles were .38 caliber class ammunition. Pursuant to a plea and cooperation agreement, Baptista agreed to testify truthfully in exchange for a joint recommendation of a nine to ten-year prison sentence on an indictment charging assault with intent to rob. Similarly, Mendes agreed to cooperate in exchange for a seven to fifteen-year prison sentence on a "reduced charge." Baptista's and Mendes's plea agreements were introduced in evidence at trial, and the judge instructed the jury before they testified that, bearing in mind the potential "future benefits" conferred by the plea agreements, the jury were to examine their testimony "with caution and great care."

Neither defendant testified. Their theory of defense was that Baptista and Mendes were responsible for the victim's death, and that their testimony should not be believed.

2. Exposure to excluded evidence. A surveillance video recording from the club was played during Baptista's testimony and introduced in evidence. The audio portion of the recording revealed that Baptista asked the bartender to use her telephone before stating that "[s]omebody got shot down the street." In response to a question from the bartender, Baptista denied that he was the shooter. The judge excluded the audio portion of the recording on hearsay grounds, but expressed a willingness to revisit the issue if Baptista's earlier statement to the Hess employee (that he shot someone with a shotgun) was raised on cross-examination. The video portion of the recording was then played for the jury without the audio. Although Baptista was cross-examined about his statements to the Hess employee, the Commonwealth did not seek to introduce the audio portion of the recording.

On the second day of deliberations, the judge received a note from the jury, which stated, "Exhibit 36 Portuguese Sports Club, in the courtroom only video was presented, we have just found it to have audio. Is there any issue with us listening to the video?" The judge confirmed that exhibit 36 included the audio portion that had been excluded. The defendants immediately moved for a mistrial, which the judge denied. Although counsel for DaCosta initially suggested individual voir dire to determine what each juror heard, he agreed with the judge's decision to first ask the foreperson "how much of the audio tape . . . was listened to." Before the foreperson entered the court room, the judge found "that the error was inadvertent and was not intentionally done." The foreperson explained in an unsworn statement that the jury

"just heard Baptista say someone shot someone outside. That's all we heard and we stopped it because we didn't hear that in here." In response to a question from the judge, the foreperson confirmed that the jury heard nothing before or after that statement.

The judge denied the defendants' renewed motion for a mistrial, noting that she would have admitted the entire recording "under the doctrine of rehabilitation" had the Commonwealth offered the audio portion after Baptista's cross-examination. Counsel for DaCosta then requested that the judge inquire of each juror individually whether they could abide by her instruction and strike the audio recording from their minds. Ultimately, he agreed that the judge could "ask them as a group."

When the jury reentered, the judge reminded them that the audio portion of the recording had not been admitted in evidence and explained that she "had the foreman come in so that we could explore exactly how much of that audio you listened to and it seemed to be a very brief section of the audio." She then instructed them "in very, very forceful terms that you are to strike whatever you heard, whatever portion of the audio that you heard from Exhibit 36 from your minds and you are not to consider it at all in your deliberations." When the judge inquired if any juror was unable to follow those instructions, no juror responded in the affirmative.

After a recess, the defendants renewed their request for a mistrial on the ground that the judge had not conducted an individual voir dire of the jurors. The defendants declined the judge's offer to conduct individual voir dire at that point, stating, "that's just calling more attention to it at this point." The renewed motion for a mistrial was denied.

*DaCosta*, 132 N.E.3d at 1072–74. A jury found Petitioner guilty of unlawful possession of a firearm and felony-murder in the second degree.

## III.   HABEAS STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "demands that a federal habeas court measure a state court's decision on the merits against a series of 'peculiarly deferential standards.'" *Porter v. Coyne-Fague*, 35 F.4th 68, 74 (1st Cir. 2022) (quoting *Cronin v. Comm'r of Prob.*, 783 F.3d 47, 50 (1st Cir. 2015)). "Under the peculiarly deferential standards of [AEDPA], . . . error by a state court, without more, is not enough to warrant federal habeas relief." *Bebo v. Medeiros*, 906 F.3d 129, 134 (1st Cir. 2018) (internal quotations omitted). To obtain such relief, a petitioner must establish that the state court judgment (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2)

"was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d).

A state court's decision is "contrary to clearly established federal law" if it either "announces a rule of law that directly contradicts existing Supreme Court precedent or if the state court has reached a different result than the Supreme Court on materially indistinguishable facts." *Cronin*, 783 F.3d at 50. "An unreasonable application occurs when 'the state court identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case.'" *Bebo*, 906 F.3d at 134 (quoting *White v. Woodall*, 572 U.S. 414, 425 (2014)). "Federal habeas relief only 'provides a remedy for instances in which a state court unreasonably *applies* [the Supreme] Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error." *Id.* (quoting *Woodall*, 572 U.S. at 426). "Importantly, an *unreasonable* application of federal law is different from an *incorrect* application of federal law. If fairminded jurists could disagree on the correctness of the state court's decision, there was no unreasonable application of federal law." *Hollis v. Magnusson*, 32 F.4th 1, 8 (1st Cir. 2022) (quoting *Scott v. Gelb*, 810 F.3d 94, 101 (1st Cir. 2016) (internal quotation marks and citations omitted)). In the end, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woodall*, 572 U.S. at 419–20.

Under section 2254(d)(2), "[f]ederal habeas review of a state court's factual findings is similarly constrained." *Mastracchio v. Vose*, 274 F.3d 590, 597 (1st Cir. 2001). Not only must the petitioner demonstrate "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), but the habeas statute requires that "a determination of a factual issue made by a State court shall be presumed to be correct" and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence," 28 U.S.C.

§ 2254(e)(1). "A habeas petitioner therefore must clear a high hurdle before a federal court will set aside any of the state court's factual findings." *Mastracchio*, 274 F.3d at 598; *see also Porter*, 35 F.4th at 79 (discussing the interplay between §§ 2254(d)(2) and (e)(1)).

## IV.   DISCUSSION

Petitioner advances three arguments in support of his habeas petition. The court considers each in turn.

### A.  Jury Instructions on Maximum Penalty for Predicate Offense for Felony-Murder

Petitioner first contends that his felony-murder conviction must be vacated because the Commonwealth presented no evidence regarding the maximum penalty for the predicate offense; instead, the trial judge instructed the jury as a matter of law regarding the maximum sentence for the underlying predicate. Petitioner argues this instruction relieved the Commonwealth of its burden of proving an essential element of second-degree felony-murder. Specifically, Petitioner argues the maximum penalty for the predicate felony — in this case, armed assault with intent to rob[1] — is an element of the crime of felony-murder that must be proven by the Commonwealth with sufficient evidence and found by a jury beyond a reasonable doubt. In support, he relies heavily on citation to *Commonwealth v. Christian*, 722 N.E.2d 416, 423 (Mass. 2000). Petitioner asserts the judge's jury instructions therefore violated both his right to a trial by jury and his due process right to sufficient evidence as to each element of the crime.

The court begins by addressing Petitioner's contention that this court's review of his first claim should be de novo, based on his perception that the MAC ruled only on his jury trial right argument and did not consider his sufficiency argument. The court disagrees.[2] The MAC's discussion of the

---

[1] Under Massachusetts law, armed assault with intent to rob is punishable by a maximum of twenty years' imprisonment. *See* Mass. G.L. c. 265, § 18(b).

[2] Nor is the claim subject to de novo review on the basis that the MAC's decision on the jury trial right argument was "contrary to" established Supreme Court precedent in *In re Winship*, 397 U.S. 358 (1970). The *Winship* rule, which requires the state to prove all facts necessary to the charged crime, "must be applied with explicit reference to the substantive

"maximum penalty" claim was included in its analysis of Petitioner's sufficiency claims and the court expressly acknowledged it as a sufficiency claim. *See DaCosta*, 132 N.E.3d at 1076–77 (reciting *Latimore/Jackson* sufficiency standard, stating "defendants contend that the Commonwealth failed to offer sufficient proof that the maximum penalty for armed assault with intent to rob, the predicate felony for the conviction of felony-murder in the second degree, was less than life imprisonment"); *Foxworth v. St. Amand*, 570 F.3d 414, 426 (1st Cir. 2009) (explaining *Latimore* sufficiency standard under Massachusetts law is essentially the same as the federal *Jackson* standard). Moreover, upon careful review of the state court's decision, the court discerns the MAC implicitly denied the sufficiency claim on the merits. Petitioner's argument to the MAC was that the Commonwealth failed to present sufficient evidence to the jury regarding an element of the offense, but because (as the MAC clarified) the maximum penalty for the predicate is a matter of law, not an element to be submitted to the jury, it follows that the sufficiency claim necessarily failed. Accordingly, this court's review of the MAC's decision finds Petitioner's federal sufficiency claim was adjudicated on the merits and is therefore entitled to deference under § 2254(d)(1).

After careful review, the court concludes Petitioner's claim is not cognizable on habeas review. The MAC resolved Petitioner's argument as a matter of Massachusetts law regarding felony-murder, and it is well established that "[f]ederal courts sitting in habeas must accept state court rulings on state law issues." *Rodriguez v. Spencer*, 412 F.3d 29, 37 (1st Cir. 2005). "Errors of state law are not a cognizable basis for federal habeas relief" — a principle the First Circuit has applied to affirm the denial of habeas claims, such as Petitioner's, "involv[ing] complicated matters of felony murder doctrine under state common law." *Cruz v. Maloney*, 152 F. App'x 1, 3 (1st Cir. 2005).

---

elements of the criminal offense as defined by state law." *Jackson v. Virginia*, 443 U.S. 307, 324 n.16 (1979). As explained in this decision, Massachusetts courts have determined that the penalty for a predicate felony is a matter of law, not fact. Thus, there is no *Winship* violation. Regardless, the court's analysis would remain the same even under de novo review.

It is well-established law that states have the power to define criminal offenses and designate their essential elements. *See McMillan v. Pennsylvania*, 477 U.S. 79, 85 (1986); *Hardy v. Maloney*, 909 F.3d 494, 500 (1st Cir. 2018). On Petitioner's direct appeal of his conviction, the MAC held as a matter of state law that the question of "whether a felony can serve as a predicate for murder in first or second degree is a question of law," not an element that must be submitted to the jury. In other words, as to element one of second-degree felony-murder on a theory of joint venture, the Commonwealth need only prove that the defendant knowingly participated in the commission or attempted commission of the predicate felony. Elements two and three, respectively, require proof that death occurred during such actual or attempted commission and that the felony was either inherently dangerous (a matter of law under Massachusetts state law) or the defendant participated in the felony with conscious disregard for the risk to human life. This formulation is consistent with other precedent regarding the elements of felony-murder under Massachusetts law.[3] That some caselaw, such as *Christian*, were somewhat inartful in crafting the recitation of element one as including the penalty for the predicate felony does not make it an issue of fact for the jury.[4] *DaCosta*, 132 N.E.3d at 1079; *see Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal

---

[3] *See, e.g., Wadlington v. Mitchell*, No. 15-cv-10468, 2019 WL 360763, at *10 (D. Mass. Jan. 29, 2019) (designating "the elements of felony murder as (1) an unlawful killing, (2) committed in the course of a felony, and (3) the defendant committed the felony with a conscious disregard for human life" (quoting *Mello v. DiPaulo*, 295 F.3d 137, 149 (1st Cir. 2002))); *Commonwealth v. Garner*, 795 N.E.2d 1202, 1210 (Mass. App. Ct. 2003) (describing the elements, in relevant part, as requiring proof that "(1) the defendant participated in a felonious enterprise; (2) a homicide occurred in the course of that enterprise; [and] (3) the felony was inherently dangerous to human life or committed with conscious disregard on the part of the defendant for the risk to human life"; *Commonwealth v. Garcia*, 18 N.E.3d 654, 667 (Mass. 2014) ("there must be a homicide that occurs during the commission or attempted commission of a felony; the homicide must be a 'natural and probable consequence' of the predicate felony; and the felony must be either 'inherently dangerous' or 'committed . . . [with] conscious disregard of the risk to human life'" (internal citations omitted)); *Commonwealth v. Thomas*, 124 N.E.3d 160 (Mass. App. Ct. 2019) (table) (same).

[4] This is analogous to the issue of whether a felony is "inherently dangerous" under Massachusetts law: While most caselaw articulates element three of the felony-murder doctrine as requiring the felony to be "inherently dangerous or committed with conscious disregard for human life," such an articulation does not transform the determination of whether a felony is inherently dangerous into a jury issue. *Compare Commonwealth v. Christian*, 722 N.E.2d 416, 423 (Mass. 2000) (describing second-degree felony-murder as "requir[ing] the jury to find" both the predicate felony's maximum penalty and that the felony was inherently dangerous), *with Commonwealth v. Scott*, 701 N.E.2d 629, 632 (Mass. 1998) ("It is not the province of the jury to determine whether a felony is inherently dangerous.").

of the challenged conviction, binds a federal court sitting in habeas corpus."). Indeed, Petitioner cites no caselaw, in Massachusetts or otherwise, where a court has held the statutory penalty for a predicate offense is an element of a crime that must be proven to and found by a jury.

Innumerable Massachusetts Supreme Judicial Court rulings further support the MAC's determination. *See, e.g.*, *Commonwealth v. Burton*, 876 N.E.2d 411, 414–15 (Mass. 2007) (reducing first-degree felony-murder conviction as "not legally permissible" because, at time of offense, maximum penalty for underlying predicate was less than life imprisonment); *Commonwealth v. Paulding*, 777 N.E.2d 135, 141–43 (Mass. 2002) (where evidence *only* supports finding defendant committed an underlying predicate that is punishable by a maximum of life imprisonment, then instruction only on first-degree felony-murder is warranted; no basis for instruction on second-degree felony-murder because such conviction would be "legally untenable" and a "legal fiction"); *Commonwealth v. Garcia*, 18 N.E.3d 654, 667 (Mass. 2014) (same); *Commonwealth v. Brown*, 81 N.E.3d 1173, 1191 (Mass. 2017) (Gants, C.J., concurring) ("Because the underlying crimes were both felonies punishable by life in prison, the jury properly were not instructed on felony-murder in the second degree, because the evidence did not permit such a verdict."); *cf.* Massachusetts Supreme Judicial Court's Model Jury Instructions on Homicide 61 (2013) ("I instruct you that this crime is a felony with a maximum sentence of less than life imprisonment"); 14A Mass. Prac. § 7:151 n.15 (5th ed.) ("The judge informs the jury whether the felony in question is one with a maximum sentence of less than life imprisonment."). Consistent with the MAC's ruling, these authorities indicate that Massachusetts courts routinely view the issue of whether an underlying felony can serve as a predicate for first- or second-degree felony-murder — and implicitly, what the maximum statutory penalty for an underlying felony is — as questions of law for the court to determine under state law, not issues of fact to be submitted to the jury.

Ultimately, the trial court's instruction[5] and the MAC's decision on appeal boil down to an issue of Massachusetts state law. Petitioner's "attempt[] to [re]cast this claim in a constitutional light" is "unavailing." *Wadlington v. Mitchell*, No. 15-cv-10468, 2019 WL 360763, at *10 (D. Mass. Jan. 29, 2019). In sum, Petitioner's argument brushes aside long-standing Massachusetts precedent indicating that the determination of whether a felony can serve as predicate for first- or second-degree felony-murder is a matter of law, not fact. "Thus, the trial judge properly instructed the jury as to the elements of a felony-murder under Massachusetts law at that time[6] and did not relieve the prosecution of [its] burden" under *In re Winship*, 397 U.S. 358 (1970), to prove every fact necessary to the crime charged beyond a reasonable doubt. *Id.*

## B. Evidence of Petitioner's Knowledge that Co-Venturer was Armed

Petitioner next asserts there was insufficient evidence to establish he knew one of his co-venturers was armed with a dangerous weapon. When reviewing a challenge to the sufficiency of the evidence, a habeas court asks "[w]hether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).[7] Under federal habeas review, "a state-court decision rejecting a sufficiency challenge may not be overturned . . . unless the decision was objectively unreasonable." *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (internal quotation marks omitted). The Supreme Court has described these layered requirements as a "twice-

---

[5] It is worth noting that trial counsel did not dispute that armed assault with intent to rob carried a maximum sentence of less than life imprisonment or could serve as a predicate for second-degree felony murder. (Dkt. No. 11-12 at 232–33). Based on the record before the court, the court cannot discern for certain, but it appears trial counsel did not object to the relevant portion of the jury instructions now challenged. However, because neither the parties nor the MAC raised the prospect of waiver, the court does not address it.

[6] Felony-murder in the second degree has since been prospectively abolished in Massachusetts. *See Brown*, 81 N.E.3d at 1196 n.4 (Gants, C.J., concurring).

[7] As noted, the MAC reviewed Petitioner's sufficiency claims using a state analog to *Jackson*. *See DaCosta*, 132 N.E.3d at 1076 (discussing *Latimore*, 393 N.E.2d at 374); *see also Akara v. Ryan*, 270 F. Supp. 3d 423, 432 (D. Mass. 2017) (state court decisions that review sufficiency of evidence claims under *Latimore* are "entitled to deference under 28 U.S.C. §2254(d)(1)").

deferential standard." *Id.*; *see also Winfield v. O'Brien*, 775 F.3d 1, 8 (1st Cir. 2014) ("In other words, we do not ask, as we might on direct review of a conviction in federal court, whether the evidence was constitutionally sufficient. We ask, instead, whether the state courts' ruling that the evidence is constitutionally sufficient was itself 'unreasonable.'").

Petitioner was convicted of felony-murder on a theory of joint venture, with the underlying felony being armed assault with intent to rob. Under Massachusetts law, "[t]he elements of armed assault with intent to rob are that the defendant, armed with a dangerous weapon, assault[ed] a person with a specific or actual intent to rob the person assaulted." *Commonwealth v. Rivera*, 833 N.E.2d 1113, 1122 n.15 (Mass. 2005). Because the underlying felony includes as one of its elements the use or possession of a weapon and because the Commonwealth proceeded on a theory of joint venture, the Commonwealth was required to prove Petitioner knew that a joint venturer was armed with a dangerous weapon as an element of its case. *See Commonwealth v. Britt*, 987 N.E.2d 558, 569 (Mass. 2013) (explaining the requirement of knowledge of a weapon applies "where the conviction is for felony-murder and the underlying felony has as one of its elements the use or possession of a weapon"); *Garcia*, 18 N.E.3d at 662 (knowledge of weapon required for felony-murder liability where defendant prosecuted on theory of joint venture and underlying felony involved weapon; armed assault with intent to rob requires knowledge of weapon).

Petitioner claims there was insufficient evidence of that element here and that the MAC's conclusion to the contrary was based on an unreasonable determination of the facts. The court disagrees. It is well established that "[a] criminal conviction may be supported by circumstantial evidence alone." *Linton v. Saba*, 812 F.3d 112, 123 (1st Cir. 2016). "This principle [that direct evidence is not required to uphold a conviction] is even more firmly established in connection with the deferential approach to state-court decisionmaking that federal habeas review demands." *Id.* (quoting *Magraw v. Roden*, 743 F.3d 1, 6 (1st Cir. 2014)). When a federal habeas court is "faced with a record . .

. that supports conflicting inferences," the court "must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* (quoting *Jackson*, 443 U.S. at 326).

In this case, the evidence adduced at trial indicates that Petitioner, DaCosta, and Mendes formed a plan to rob a drug dealer and enlisted Baptista to call and arrange a meeting with a drug dealer, whom the rest of the group would then rob. (Dkt. No. 11-9 at 87–91; Dkt. No. 11-12 at 82–89). Indeed, Baptista testified it was Petitioner who first told him a week before the incident that he planned to rob drug dealers to get them off the street, and Petitioner plainly knew the target that evening sold drugs. Moreover, Petitioner had spent a few hours before the incident with Baptista, DaCosta, and Mendes. *See Commonwealth v. Tracy*, 539 N.E.2d 1043, 1045 (Mass. App. Ct. 1989) (jury could infer knowledge coventurer was armed, in part based on fact they "spent the afternoon together prior to the robbery" and therefore "had an opportunity to plan the undertaking"). The trial testimony reveals he was aware of the plan and agreed to it. (Dkt. No. 11-12 at 88–89; Dkt. No. 11-9 at 101). Petitioner, DaCosta, and Mendes enlisted Baptista to call a drug dealer Baptista personally knew. Petitioner gave Baptista money to show the victim when they met up to make it seem like a legitimate drug transaction, and the group dropped Baptista off down the road from the meeting point with the victim so as not to arouse suspicion. Contrary to Petitioner's characterization of the attempted robbery as "haphazard," a reasonable jury could infer from these facts that the group had carefully planned how to rob the victim. A reasonable jury could also infer that "a plan to rob a drug dealer would include [a weapon, such as] a gun," as a means to persuade the victim to surrender his money or drugs. *See Commonwealth v. Cooley*, 78 N.E.3d 77, 82 (Mass. 2017).

In addition, Petitioner and DaCosta were both inside the club when DaCosta called or texted Mendes to tell him he had arranged for a friend named Chris to deliver a gun to the club. (Dkt. No.

11-12 at 82, 87, 90–91, 95–96).[8, 9] This occurred within the same timeframe the group was planning and setting up the robbery. Coupled with the testimony Petitioner was generally with DaCosta throughout the night, that Petitioner and DaCosta were friends, and that Petitioner was informed of the plan and agreed to it, a reasonable jury could infer Petitioner knew DaCosta planned on having a gun during the robbery. Similarly, Mendes' testimony provided ample basis for a reasonable jury to infer Petitioner saw or was otherwise aware of what DaCosta and Mendes were doing when they retrieved the gun from the trunk of Mendes' car. (Dkt. No. 11-12 at 101–02 (stating he did not know where Petitioner was located in relation to the car when he and DaCosta retrieved the gun, but that he was near or getting into the car at the time); Dkt. No. 11-12 at 201 (stating Petitioner got into the back seat around the time he and DaCosta retrieved the gun from the trunk)). Petitioner also exited the Mendes' vehicle at the scene with DaCosta and approached the victim's vehicle; after the shooting, he ran back to Mendes' car with DaCosta. (Dkt. No. 11-12 at 105–07). These facts are adequate for a reasonable jury to infer Petitioner saw or knew DaCosta was holding a gun when they were approaching the victim.

While Petitioner points to other evidence in the record indicating Mendes and Baptista did not personally see DaCosta holding the gun while in the car or approaching the victim, this testimony does not negate the other evidence, described above, from which a reasonable jury could infer Petitioner was aware DaCosta had a gun. Indeed, although Mendes testified he did not visually observe

---

[8] This evidence also indicates the group, or at least DaCosta, "reasonably anticipated" the victim's resistance. *See Cooley*, 78 N.E.3d at 82. A reasonable jury could infer from the testimony Petitioner and DaCosta were together in the club prior to the planned robbery that Petitioner knew DaCosta arranged to have a gun delivered and also anticipated resistance from the victim.

[9] Baptista testified he did not know about the gun before the shooting occurred. While trial testimony indicates Baptista was largely with and near Petitioner and DaCosta in the club in the couple of hours beforehand, Baptista also testified he left for approximately 20 minutes around 10:30 p.m. to smoke or purchase drugs and that he went to the bathroom on the other side of the club to call the victim. (Dkt. No. 11-9 at 95, 159, 173–75). The testimony further suggested Petitioner and DaCosta were friends, whereas the group simply recruited Baptista that evening to set up a meeting with a drug dealer for them to rob. A reasonable jury could infer from this testimony that Petitioner knew about the gun before the planned robbery although Baptista did not.

the gun on DaCosta's person when he was in the car or got out to approach the victim, there is no dispute Mendes knew DaCosta was armed. A reasonable jury could similarly infer from the circumstantial evidence that Petitioner also knew DaCosta was armed, even if he did not see the gun. At most, the testimony emphasized by Petitioner suggests that the jury *could* have inferred Petitioner did not know a coventurer was armed. That the record could perhaps support a conflicting inference is insufficient to prevail on a sufficiency challenge on habeas review. As noted, this court "must presume" the jury "resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Linton*, 812 F.3d at 123 (quoting *Jackson*, 443 U.S. at 326).

Finally, as the MAC explained, a reasonable jury could find Petitioner's actions after the shooting evinced a "consciousness of guilt," further buttressing the inference Petitioner knew DaCosta was armed before the incident. *See Commonwealth v. Vick*, 910 N.E.2d 339, 347 (Mass. 2009) ("While a conviction may not be based solely on evidence of consciousness of guilt, . . . indications of a defendant's state of mind, coupled with other evidence, can be sufficient to establish guilt."). The trial testimony supports a finding that Petitioner not only exited Mendes' vehicle and approached the victim's car at the same time as DaCosta, but also returned to and reentered Mendes' vehicle with DaCosta after DaCosta shot the victim. (Dkt. No. 11-12 at 105–07). The group then traveled back to the club before going to a friend's house on Division Street and Petitioner remained with DaCosta and Mendes for a while after the incident. Baptista, who did not leave the scene with the others, tried to call Petitioner to talk about what happened. (Dkt. No. 11-9 at 109–10). When Baptista later arrived at the house and DaCosta threatened Baptista to stay silent, Petitioner intervened and assured DaCosta that Baptista would not say anything about that evening's events. (Dkt. No. 11-9 at 114; Dkt. No. 11-12 at 114–16). Petitioner also accepted return of the money he had given Baptista before the robbery to make the drug transaction appear legitimate and he was present when DaCosta smashed the victim's phone on the ground to break it. (Dkt. No. 11-9 at 114–15; Dkt. No. 11-12 at 116–17). From this

evidence of joint flight as well as Petitioner's presence during the destruction of evidence and threatening of a witness, the jury was entitled to infer Petitioner's knowing participation in all aspects of the joint venture to rob the victim, including knowledge that DaCosta was armed. *See Commonwealth v. Stuckich*, 879 N.E.2d 105, 110 (Mass. 2008) (explaining an inference of guilt may be drawn from evidence of flight, destruction or concealment of evidence, and other similar acts); *DaCosta*, 132 N.E.3d at 1078 (collecting cases).

In sum, the MAC held there was sufficient circumstantial evidence introduced at trial for a reasonable jury to infer Petitioner knew a coventurer was armed. *See DaCosta*, 132 N.E.3d at 1077–78. This conclusion is not unreasonable in light of Mendes' and Baptista's testimony regarding that evening. Although Petitioner highlights several conflicting inferences the jury could have drawn and points to certain weaknesses in the trial record, the critical inquiry for this court sitting in habeas is "not whether the evidence was so lush and beyond reproach as to prove the [P]etitioner's guilt beyond *any* doubt, but rather whether the evidence in a light most favorable to the prosecution would permit any rational jury to find the essential elements of the crime beyond a reasonable doubt." *Bin v. Rodrigues*, No. 19-cv-11670, 2023 WL 4033956, at *11 (D. Mass. Mar. 2, 2023) (emphasis added), *report and recommendation adopted by* 2023 WL 4033306 (D. Mass. Mar. 21, 2023); *see also Sivo v. Wall*, 644 F.3d 46, 50 (1st Cir. 2011) ("In practice habeas review under *Jackson* . . . is reserved for unusual cases and its standard is rarely met where there is plausible evidence to support a verdict. (internal quotation marks omitted)). The court concludes that standard has been satisfied here. Accordingly, Petitioner's second habeas claim is denied.

## C. Jury's Exposure to Excluded Evidence

Petitioner's final claim is that the MAC unreasonably determined the trial judge's failure to conduct an individual voir dire after the jury was exposed to excluded audio from Exhibit 36 was harmless error. In order to succeed on this claim, Petitioner must satisfy both AEDPA and *Brecht v.*

*Abrahamson*, 507 U.S. 619 (1993). When, as here, a state court has applied the harmless error test under *Chapman v. California*, 386 U.S. 18 (1967), "§ 2254(d)(1) requires a habeas petitioner to prove that the state court's decision was unreasonable," meaning "no fairminded jurist could reach the state court's conclusion under th[e] [Supreme] Court's precedents." *Brown v. Davenport*, 596 U.S. 118, 135 (2022) (alteration adopted; alterations added; citations and internal quotation marks omitted). Alternatively, a habeas petitioner may satisfy AEDPA if he establishes that the state court's decision was based on an unreasonable determination of the facts under § 2254(d)(2), which requires more than a mere showing that "reasonable minds reviewing the record might disagree about the finding in question." *Id.* (quoting *Brumfield v. Cain*, 576 U.S. 305, 314 (2015)).

In addition to making the requisite showing under one of the prongs of AEDPA, to secure habeas relief, a petitioner must also then satisfy *Brecht* by "persuading a federal court that it . . . should harbor 'grave doubt' . . . about whether the trial error affected the verdict's outcome" — that is, whether the error "had a substantial and injurious effect or influence on the verdict." *Id.* at 133, 135–36 (citation omitted); *Brecht*, 507 U.S. at 637. The court cannot grant habeas relief unless it finds "the petitioner has cleared both tests." *Davenport*, 596 U.S. at 134. If, however, the petitioner fails to satisfy *either* standard (AEDPA/*Chapman* or *Brecht*), the court must deny relief and the court need not formally apply the other test. *Id.*

With respect to AEDPA, Petitioner advances two purported flaws in the MAC's determination.[10] First, Petitioner contends the MAC's decision rests on unreasonable findings of fact[11]

---

[10] Petitioner has withdrawn his argument the MAC applied a "lesser standard" than the standard prescribed in *Chapman*. (Dkt. No. 30 at 40–42; Dkt. No. 36 at 8 n.4).

[11] While § 2254(d)(2) authorizes relief where a state court's decision is based on an "unreasonable determination of the facts," subsection (e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct" and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." The First Circuit has routinely held petitioners to the "clear and convincing standard," but has thus far followed the Supreme Court's suit and declined to clarify precisely how §§ 2254(d)(2) and (e)(1) fit together. *See Porter v. Coyne-Fague*, 35 F.4th 68, 79 (1st Cir. 2022); *Smith v. Dickhaut*, 836 F.3d 97, 101 (1st Cir. 2016). Here, as in most cases, it does not appear that "resolving the fit between the two sections" would "ma[k]e any difference." *Smith*, 836 F.3d at 101. Even assessing

as to how much of the audio the jurors heard, ignores evidence suggesting the jurors substantively discussed the audio, and wrongly relied on a finding that "[n]o juror indicated they heard more than what the foreperson stated they heard" since the trial judge did not ask collective questions of the jury regarding Exhibit 36. The court disagrees.

Despite Petitioner's argument to the contrary, it is apparent from the record that the trial judge did, in fact, make a finding — at least implicitly, if not explicitly — regarding how much of the audio the jury heard by crediting the foreperson's adamant report the jury heard Baptista say "somebody got shot in the street" before promptly stopping the video. (Dkt. No. 11-15 at 15–17, 25–28). In crediting the foreperson's report the jurors stopped the video immediately after they heard "someone shot someone outside," the trial judge reasonably inferred that no juror heard Baptista's statement 10 seconds later denying *he* was the shooter. Petitioner asserts it was unreasonable to credit the foreperson's report because he did not report first hearing Baptista ask to use the bartender's phone before stating "someone shot someone outside," but the trial judge plainly assumed the jury also heard Baptista's preceding request to use the phone. (*See id.* at 12, 25–26). In any event, the foreperson's failure to mention Baptista's earlier phone request, instead focusing on disclosing the jury's exposure to the sentence that seemed more relevant and the time at which they stopped the video, does not necessarily render unreliable his unwavering statement as to when the jurors paused the clip. It is axiomatic that credibility determinations are best suited for the trial judge and such determinations are not easily disturbed on appellate, let alone collateral, review. *See Davis v. Ayala*, 576 U.S. 257, 274 (2015) ("determinations of credibility and demeanor lie peculiarly within a trial judge's province" (citation omitted)); *Teti v. Bender*, 507 F.3d 50, 59 (1st Cir. 2007) ("[T]he state trial judge's implicit credibility determinations, adopted by the MAC, are exactly the type of factual determinations to which we defer,

---

"the state court's factual determination under the more petitioner-friendly standard set out in § 2254(d)(2), rather than the more deferential standard in 2254(e)(1)," the court concludes Petitioner is not entitled to the relief he seeks. *Id.*

as least short of any indication of serious error."); *Rice v. Collins*, 546 U.S. 333, 341–42 (2006) ("Reasonable minds reviewing the record might disagree about the [foreperson]'s credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination.").

Nor is the court persuaded by Petitioner's argument speculating some jurors may have heard Baptista deny he was the shooter or that the jurors may have substantively discussed the audio based on the foreperson's statement the video was stopped at "one something." (Dkt. No. 11-15 at 16). There is nothing in the record to support these suppositions. A review of Exhibit 36 indicates, as the trial judge found, Baptista stated "somebody got shot in the street" approximately 10 to 12 seconds into the video clip (Dkt. No. 11-15 at 12 (finding he made the statement "by second number 13")); the sentence wherein Baptista denied that he himself was the shooter occurred 22 to 23 seconds into the video clip. It was reasonable for the trial judge and the MAC to infer this 10 second gap provided sufficient time for the jurors to stop the video, and in turn, to credit the foreperson's report they immediately stopped the video upon realizing they had not previously heard the accompanying audio and heard no more after "someone shot someone outside." Petitioner offers nothing but rank speculation that the jurors could not have had enough time to stop the video at the time represented by the foreperson.

Petitioner's assertion the jury must have substantively discussed the audio given the foreperson's statement the jury stopped the video at "one something" is likewise pure conjecture. (Dkt. No. 11-15 at 16). While Petitioner insists this is a reference to the time of day Baptista visited the bar (i.e., at or about one o'clock in the morning the night of the shooting) based on other trial testimony, it is an equally plausible reading of the record that the foreperson was referring to the time on the video when the jury stopped it (i.e., how many seconds into the video had elapsed when they stopped it). (Dkt. No. 11-15 at 16 (when asked "what time you stopped it," the foreperson said he "asked for the time on the clip" and was told "one something")). Understood in this manner, the

foreperson's statement they pressed pause at "one something" seconds into the video further buttresses the state court's finding that the jurors did not hear Baptista deny he was the shooter, which occurred at second number 22 to 23 of the clip. At best, Petitioner simply offers a different interpretation of the evidence that was before the state court, which is insufficient to demonstrate unreasonableness. *See Brumfield*, 576 U.S. at 314 (to obtain habeas relief under § 2254(d)(2), it is not enough to show that "reasonable minds reviewing the record might disagree about the finding in question").

Finally, Petitioner maintains the MAC was wrong to rely, in part, on a finding that "[n]o juror indicated they heard more than what the foreperson stated they heard." In support, Petitioner correctly points out that the trial judge did not ask collective questions of the jury regarding Exhibit 36.[12] Nevertheless, the MAC's statement is accurate: when the trial judge addressed the jurors and noted the foreperson represented they had heard only a brief portion of the audio, no juror indicated that representation was wrong, nor is there anything elsewhere in the record to suggest any juror later indicated they had heard more than what the foreperson said they heard. While the MAC's statement perhaps could have been better articulated, the court concludes Petitioner has not shown it to be incorrect by clear and convincing evidence nor is it unreasonable. Even recognizing that any findings about what each of the jurors actually heard on the clip and when it was stopped are speculative, to an extent, insofar as they were extrapolated from the foreperson's report, Petitioner cannot meet his high burden to show that no reasonable mind reviewing the record could agree with the state court's

---

[12] Though not directly pertinent to the court's analysis, it bears mention that the decisions to not ask collective questions as to what the jurors heard and to not specify precisely what the foreperson reported they heard were apparently made at the behest of trial counsel. (Dkt. No. 11-15 at 25–26). Similarly, defense counsel agreed the trial judge could ask the jurors "as a group" whether the audio they heard would affect their impartiality and whether they were able to follow an instruction to strike it from consideration. (*Id.* at 24–25). When counsel renewed their motions for mistrial after a recess and the trial judge offered to conduct individual voir dire at that point, counsel declined the offer due to concern about "calling more attention to it at this point." (*Id.* at 42).

findings. *See Brumfield*, 576 U.S. at 314. In sum, the court finds the MAC's factual determinations are both consistent with the trial judge's findings and reasonable in light of the record evidence.

Petitioner's second, and related argument, is that the MAC unreasonably applied *Chapman*. This argument is largely premised on Petitioner's alternative view of the facts, which the court does not credit for the reasons described above. In any event, "*Chapman* merely announced the default burden of proof for evaluating constitutional errors on direct appeal: The prosecution must prove harmlessness beyond a reasonable doubt." *Davenport*, 596 U.S. at 144. As the Supreme Court has "repeatedly explained," "when it comes to AEDPA, 'the more general the federal rule, the more leeway state courts have in reaching outcomes in case-by-case determinations' before their decisions can be fairly labeled unreasonable." *Id.* (quoting *Renico v. Lett*, 559 U.S. 766, 776 (2010) (alterations adopted)). And as the Supreme Court found in *Davenport*, this case "does not come close to exceeding that leeway." *Id.* The MAC properly identified the controlling standard, citing *Chapman*. *See DaCosta*, 132 N.E.3d at 1075. The MAC then found the trial judge's failure to conduct an individual voir dire was harmless beyond a reasonable doubt in light of the foreperson's report as to how much of the audio the jury heard; the fact that Baptista's statement "somebody got shot down the street" was cumulative of his trial testimony and therefore did not expose the jury to any new information; the trial judge's curative instruction; and the lack of any indication by the jurors that they could not strike the short portion of the audio heard from their minds and remain impartial. *Id.* at 1075–76 ("we are confident that the error did not contribute to the guilty verdict," "taint" the jury's verdict, or otherwise "prejudice[] the defendants"). Thus, "[e]ven if *some* fairminded jurist applying *Chapman* could reach a different conclusion, [the court] cannot say that *every* fairminded jurist must." *Davenport*, 596 U.S. at

144. Because Petitioner simply cannot demonstrate that every reasonable jurist would reach a different conclusion than the one reached by the MAC, his third and final claim for habeas relief is denied.[13]

<h2 style="text-align:center">V.    CONCLUSION</h2>

For the reasons discussed above, Petitioner's Petition under 28 U.S.C. § 2254 is HEREBY DENIED. In addition, Pursuant to Rule 11(a) of the Rules Governing § 2254 Proceedings in the United States District Courts, the court hereby finds that this case is not appropriate for the issuance of a certificate of appealability because Petitioner has failed to make a substantial showing of the denial of a constitutional right as to any claim, as required by 28 U.S.C. § 2253(c)(2).

This case may now be closed.

It is So Ordered.

/s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge

---

[13] Because the court concludes Petitioner has not satisfied AEDPA with respect to his final claim, the court need not address the *Brecht* analysis. *See Davenport*, 596 U.S. at 134, 138–39, 145.